**RATLIFF, Appellant,**

v.

**OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, Appellee.**

[Cite as *Ratliff v. Ohio Dept. of Rehab. & Corr.* (1999), 133 Ohio App.3d 304.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 98AP–760.

Decided March 25, 1999.

*William J. O'Malley,* for appellant.

*Betty D. Montgomery,* Attorney General, *Sally Ann Walters* and *Robert J. Zambiasi,* Assistant Attorneys General, for appellee.

BROWN, Judge.

Paul D. Ratliff, plaintiff-appellant, appeals a May 21, 1998 decision of the Court of Claims of Ohio, which found that he had failed to establish a prima facie case for handicap discrimination against the Ohio Department of Rehabilitation and Correction ("ODRC"), defendant-appellee. We affirm.

Appellant has worked for the Southeastern Correctional Institution ("SCI") since October 5, 1980. He has worked at SCI's Camp Reams boot camp since 1992 as a work gang officer. His duties include escorting the prisoners and supervising them while they work at different job sites. He testified that he has always received high evaluations from the camp.

In 1991, appellant began experiencing ringing in his ears. In 1992, he went to see Dr. Aryeh Gorenstein, an ear, nose, and throat specialist. Hearing tests revealed that appellant had tinnitus and had lost some high-pitch hearing. Dr. Gorenstein told him that he should protect his ears around loud noises. Appellant stated that for the next year he wore hearing protection when he mowed the grass or did other household activities that were loud. In February 1993, Dr. Gorenstein told him that his hearing was getting progressively worse and that he was going to have to protect his hearing by wearing earplugs.

In early 1994, Dr. Gorenstein examined appellant and told him that his hearing was continuing to deteriorate. Dr. Gorenstein told him that he must start wearing earplugs all the time. Appellant told Dr. Gorenstein that earplugs were not permitted at his job. Dr. Gorenstein suggested to him that he should call OSHA to study the noise at the camp. Appellant testified that when he made this suggestion to the lieutenants at Camp Reams, they told appellant that the problem was not with the camp, the problem was with him.

In the latter part of 1994, appellant testified that Dr. Gorenstein told appellant that he could not guarantee that he would not be deaf in two years or two months and that something had to be done to protect his hearing. Dr. Gorenstein gave a letter to appellant that stated that appellant needed to wear earplugs during

work. Appellant gave the letter to Randy Smith, who worked in the personnel office at the camp.

Appellant testified that he discussed his desire to wear earplugs at work with Lieutenant Jerry McCall, Captain Philip Scales, and Sergeant Dan Kinsel. Lieutenant McCall testified that he never discussed wearing earplugs with appellant. Captain Scales testified that he told appellant that whether he could wear his earplugs was up to Heskell Wagoner, the personnel director for SCI. Captain Scales also testified that he briefly spoke to Wagoner regarding the issue but that Wagoner never got back to him with an answer. Sergeant Kinsel testified that prior to going on leave, appellant never requested earplugs from him. Appellant testified that in all of his discussions with his supervisors, the example of Officer Smith being denied his request to wear earplugs was always brought up.

After the hearing exam in February 1995, Dr. Gorenstein told appellant that he would have to wear earplugs or go on disability. Dr. Gorenstein also told him at this time that he could not operate the heavy equipment he owned as part of his own excavation business because of the noise.

Appellant alleges that he then talked with Wagoner about wearing earplugs. Appellant testified that Wagoner told him that due to safety issues involving him, his fellow employees, and the inmates, he could not wear hearing protection at his job. Appellant further testified that the employee union also believed that earplugs would pose a health and safety concern. However, Wagoner testified that he did not learn of appellant's hearing problem until some time right before appellant requested disability retirement when Major Wolf called him and told him that they needed to replace appellant. He further testified that he never spoke to appellant or anyone else about appellant wearing earplugs prior to appellant leaving in March 1995. He specifically denied ever telling appellant that he could not wear earplugs.

Wagoner testified that the first time he spoke to appellant about his hearing problems and disability retirement was over the phone, when appellant had already gone on leave and had already made up his mind that he was going to apply for disability retirement. Appellant testified that when he and Wagoner discussed the option of disability leave, Wagoner told appellant that if he brought him his doctor's report, he would handle the paperwork.

The report from Dr. Gorenstein that appellant gave to Wagoner stated that appellant needed ear protection and needed to keep away from noise to preserve his hearing level. Using this information, Wagoner completed a disability retirement application for appellant on March 6, 1995. Wagoner checked the box on the application that stated that the applicant was permanently incapacitated from the performance of his duties. Wagoner wrote on the application that the

basis of his opinion was that Dr. Gorenstein had stated that appellant's hearing loss was irreversible and that appellant's condition might be aggravated if limitations on his duties were not imposed. Wagoner added to the application that ODRC's policy prohibited light duty for its officers. Wagoner then told appellant that he would forward the application to the Public Employees Retirement System ("PERS").

While his application for leave was pending with PERS, appellant was examined by Dr. Victor Vermeulen at the request of the state. Dr. Vermeulen told appellant that he should not work in areas where sound levels are above eighty-five decibels for prolonged periods, or he should wear earplugs. Dr. Vermeulen told him that he was otherwise able to return to work. He was also examined by Dr. Clifton Hood, an ear, nose, and throat specialist. Dr. Hood stated that appellant was not disabled from work, but he was disabled from loud noises. Dr. Hood advised appellant to either put in earplugs or stay away from loud noises.

After PERS denied appellant's application for disability benefits, appellant contacted his attorney. Appellant's attorney wrote a letter to SCI requesting that appellant be allowed to return to work and wear earplugs. Wagoner testified that the first time he received a request for accommodation to wear earplugs from appellant was when he received the letter from appellant's attorney. In February 1996, appellant returned to work and was permitted to wear earplugs while he worked.

On February 8, 1996, appellant filed an action in the Court of Claims of Ohio against ODRC, seeking damages for lost wages, lost vacation, lost medical benefits, and lost retirement benefits for the time he was unable to work at SCI due to the denial of his request to wear earplugs. Appellant claimed that he was discriminated against because of his handicap in violation of R.C. 4112.02 and 4112.99.

On May 21, 1998, the Court of Claims found that appellant had failed to establish a prima facie case of handicap discrimination because he failed to demonstrate that he was handicapped pursuant to R.C. 4112.01(A)(13).

Appellant assigns the following two errors:

"I. The Court of Claims erred in finding that Paul Ratliff was not handicapped per the definition of Revised Code 4112.01(A)(13).

"II. The Court of Claims failed to address whether Ratliff's employer perceived him to be handicapped."

In his first assignment of error, appellant argues that the decision of the Court of Claims finding that he was not handicapped pursuant to R.C. 4112.01(A)(13) was against the manifest weight of the evidence. The standard of

review in manifest-weight cases has been clearly established. In determining whether the judgment of the trial court is against the manifest weight of the evidence, a reviewing court must be guided by the presumption that the findings of the trial court are correct, as the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276. The Ohio Supreme Court has held:

"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

The evidence supports the Court of Claims' findings and judgment.

Handicap discrimination in employment is prohibited by R.C. 4112.02, which provides:

"It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the * * * handicap * * * of any person * * * to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

■ In order to establish a prima facie case of handicap discrimination, the person seeking relief must demonstrate that (1) he or she was handicapped, (2) an adverse employment action was taken by an employer, at least in part, because he or she was handicapped, and (3) he or she, though handicapped, can safely and substantially perform the essential functions of the job in question. *Hood v. Diamond Products, Inc.* (1996), 74 Ohio St.3d 298, 302, 658 N.E.2d 738, 741–742, citing *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St.3d 279, 281, 25 OBR 331, 333–334, 496 N.E.2d 478, 480–481.

The Court of Claims found that appellant failed to meet the definition of "handicap" found in R.C. 4112.01(A)(13):

" 'Handicap' means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."

In finding that appellant did not meet the definition of "handicap" pursuant to R.C. 4112.01(A)(13), the Court of Claims stated:

"The court finds that plaintiff's condition, although debilitating to a certain degree, does not meet the threshold requirement of a *substantial limitation* of a major life activity; *i.e.*, hearing. Medical evidence was presented indicating that plaintiff suffers from high-frequency sensorineural hearing loss which does not effect [*sic*] normal voice frequencies. Moreover, based upon plaintiff's testimony that he was able to engage in both work-related and recreational activities, the court finds that plaintiff's hearing was not substantially limited. Additionally, Plaintiff's Exhibit 6, a medical report dated September 12, 1995, from Clifton R. Hood, D.O., indicates that plaintiff will *eventually* suffer profound hearing loss if he is not removed from his current job. Abstinence from exposure to loud noise does not constitute a substantial limitation of a major life activity. Plaintiff has not demonstrated that he is handicapped pursuant to R.C. 4112.01(A)(13)." (Emphasis *sic*.)

In determining that appellant did not suffer from a "handicap" as defined by R.C. 4112.01(A)(13), the Court of Claims focused its analysis on finding that appellant's hearing problem did not substantially limit one or more of his major life activities.

■ The two relevant life activities that are included in R.C. 4112.01(A)(13), and that may be affected in the present case, are appellant's hearing and working. As to his hearing, appellant failed to demonstrate that his major life activity was substantially limited by his condition. Appellant has tinnitus with high-frequency hearing loss. Appellant testified that he does not have trouble hearing in normal situations involving one-on-one conversation. He also stated that he does not wear a hearing aid, and he is not deaf.

Further, that appellant's hearing is not substantially limited by his condition is demonstrated by the personal activities in which he still participates. Appellant testified that he has been able to participate in rabbit hunting (although not as much as he used to), bow hunting, and watching television. Appellant wears earplugs at home only when he mows the grass or tills the garden. Further, there was testimony from Wagoner that he saw appellant at a benefit dinner for approximately one to two hours where there was loud music playing, and appellant was not wearing earplugs. Although appellant testified that he sold his Harley–Davidson motorcycle, his backhoe, and his dumptruck because of the loud noises they produced, he presented no further evidence to support this testimony.

The medical evidence presented also fails to demonstrate that appellant's condition constitutes a substantial limitation of his hearing. Dr. Hood diagnosed tinnitus, but opined that it will only *eventually* cause profound hearing loss at some time in the future. Dr. Vermeulen diagnosed high-frequency sensory neural hearing loss but stated that such hearing loss does not affect normal voice frequencies. Dr. Walter Holbrook, a third-party doctor requested by appellant,

who reviewed the reports of the other doctors, stated in his report that appellant's high-frequency hearing has not deteriorated dramatically and that the useful conversational ranges have remained stable and are at a very useful range. Thus, although the medical evidence suggested that appellant does suffer from certain hearing maladies, his current normal-range hearing is stable and any profound hearing loss will occur, if at all, in the future. Thus, appellant failed to demonstrate that his hearing was substantially limited by his condition.

■ Appellant also failed to demonstrate that his condition substantially limited the major life activity of working. Presently, while at work he wears earplugs only when he is in a noisy situation. Appellant testified that Dr. Gorenstein and Dr. Hood told him that he was not disabled from any of his work duties but was disabled only from loud noises. Dr. Holbrook stated in his report that appellant's hearing condition should not preclude him from performing his usual and customary occupation. Appellant testified that all of the doctors that tested him told him that he was not disabled from working. Further, although Dr. Gorenstein and Dr. Hood told him that he was disabled from "loud noises," loud noises cannot be considered a major life activity. We also note that his aversion to loud noises is a precautionary measure against possible *future* deterioration of his hearing. There was no testimony that the loud noises, in and of themselves, directly limit any work activity.

Therefore, we find that the Court of Claims did not err in finding that appellant's condition did not substantially limit any major life activities. Appellant's first assignment of error is overruled.

■ Appellant argues in his second assignment of error that the Court of Claims failed to address whether appellee perceived him to be handicapped. R.C. 4112.01(A)(13) sets forth three different means of qualifying as handicapped under the statute: (1) having a physical or mental impairment that substantially limits one or more major life activities, (2) having a record of a physical or mental impairment, and (3) being regarded as having a physical or mental impairment. The Court of Claims specifically addressed whether appellant's condition substantially limited one or more life activities, and found that his condition did not substantially limit any major life activities. The court then went on to find generally that appellant did not demonstrate that he was handicapped pursuant to R.C. 4112.01(A)(13), but it did not make a specific written finding as to whether he was regarded as having a physical or mental impairment.

■ However, we note that appellant failed to request findings of fact and conclusions of law pursuant to Civ.R. 52. If a party makes no request for findings of fact and conclusions of law, the reviewing court must presume that the trial court applied the law correctly and must affirm if there is some evidence to

support the judgment. See *Allstate Fin. Corp. v. Westfield Serv. Mgt. Co.* (1989), 62 Ohio App.3d 657, 577 N.E.2d 383. In *Pettet v. Pettet* (1988), 55 Ohio App.3d 128, 130, 562 N.E.2d 929, 931–932, the court wrote:

"We conclude that when separate facts are not requested by counsel and/or supplied by the court the challenger is not entitled to be elevated to a position superior to that he would have enjoyed had he made his request. Thus, if from an examination of the record as a whole in the trial court there is some evidence from which the court could have reached the ultimate conclusions of fact which are consistent with his judgment the appellate court is bound to affirm on the weight and sufficiency of the evidence."

While the court could have further identified the criteria and legal standards that it was applying, we know of no authority, and appellant points to none, for the proposition that R.C. 4112.01 requires the court to specifically put into words all of its findings on the case. Appellee maintains that the court analyzed all three means of qualifying as handicapped pursuant to R.C. 4112.01(A)(13) but simply declined to make an express finding as to all three. We must view the trial court's decision in the same light. A judgment entry "may be general" unless a party makes a specific request for separate "findings of fact and conclusions of law." Civ.R. 52. Appellant never made such a request. Thus, if any evidence was adduced to support the judgment reached under proper rules of law applicable thereto, we must presume regularity in the proceedings below. *Scovanner v. Toelke* (1928), 119 Ohio St. 256, 163 N.E. 493, paragraph four of the syllabus.

■ Although the Court of Claims made only a general finding that appellant was not handicapped pursuant to R.C. 4112.01(A)(13), there was ample evidence to find that appellant was not regarded as having a physical impairment. There was no testimony that any employee or administrator at ODRC regarded appellant as disabled. Sergeant Dan Kinsel, appellant's former supervisor for the work gang group, testified that he never treated appellant differently, never gave him special treatment or discriminated against him, and did not consider appellant disabled because of his hearing problems. Officer John Hymen, a work gang supervisor at Camp Reams, testified that he never considered appellant disabled or treated him any differently because of his hearing. Officers Donald Numbley and Dale Howdyshell, work gang officers at Camp Reams, testified that they never treated appellant any differently or considered appellant disabled because of his hearing. Captain Philip Scales testified that he has never treated appellant differently and never considered him to be disabled or handicapped because of his hearing. Deputy Warden Jeffrey Wolf, who was a commander at Camp Reams in 1995, testified that he never treated appellant differently from others because of his hearing and did not consider him disabled. Lieutenant

Jerry McCall, an officer at Camp Reams, testified that he never treated appellant differently because of his hearing problems and never considered him disabled.

Appellant argues that Heskell Wagoner, the personnel director at Camp Reams while appellant worked at the camp, regarded him as handicapped, pointing to Wagoner's comments on appellant's application for disability retirement. On appellant's March 6, 1995 Application for a Disability Benefit Report by Employer, Wagoner marked "yes" for the following question: "Do you believe the applicant is permanently incapacitated for the performance of his/her duties?" The following line on the application asked, "If Yes, state the basis of your opinion." Wagoner responded to this by stating: "Employee's doctor has stated that the employee's hearing loss is irreversible & that employee's condition may be aggravated if duty limitations are not imposed. DRC policy is 'no light duty.'"

However, Wagoner testified that he did not learn of appellant's hearing problem until some time right before he requested disability retirement. Wagoner stated that when appellant called him and discussed disability retirement, appellant already had his mind absolutely made up that he was going to apply for disability retirement. Further, Wagoner testified that he marked that appellant was permanently incapacitated from performing his duties based upon the statement from appellant's doctor. He did not independently investigate appellant's situation and took the doctor's opinion as true in marking that appellant was permanently incapacitated. He also testified that he routinely would mark the permanent-incapacity section "yes" based on a doctor's opinion. Wagoner stated that it was his policy to stay neutral when an employee applies for disability retirement, unless he knows that the person is doing something illegal. Thus, we find that Wagoner's responses on the disability retirement application do not provide evidence upon which to find that appellant was regarded as having a physical or mental impairment.

We also note that Wagoner testified that through the camp's "pick-a-post" program, appellant could have picked another job assignment that was less noisy during the period in question. Appellant was fourth in seniority at the camp, and Wagoner testified that he would have had little difficulty getting an open post. Some of the jobs that were posted for 1995 that he would consider low noise would have been key control and mail room officer. In fact, appellant testified that during the time he was off work, he was notified by SCI that he could choose any open post he wanted, but he chose to stay at his same post, despite admitting that his seniority status gave him a fairly good chance of getting a post he bid on.

Therefore, because appellant failed to request findings of fact and conclusions of law and because there was ample evidence to support the court's judgment, appellant's second assignment of error is overruled.

Accordingly, appellant's assignments of error are overruled, and the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

BOWMAN and JOHN C. YOUNG, JJ., concur.

JOHN C. YOUNG, J., retired, of the Tenth District Court of Appeals, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.